## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BRYAN L. CURRY,

        Petitioner,

v.                             Case No. 8:19-cv-798-WFJ-SPF

SECRETARY, DEPARTMENT OF
CORRECTIONS,

        Respondent.

_____/

### ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Bryan L. Curry petitions for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his state court conviction and life sentence for second-degree murder. Having reviewed the petition and supporting memorandum, Dkts. 1 & 2, the Respondent's response and supporting appendix, Dkt. 10, and Curry's reply, Dkt. 13, the Court denies the petition.

### BACKGROUND AND PROCEDURAL HISTORY

***Conviction and Direct Appeal.*** On December 13, 2004, construction workers found Ingrid Lugo's body in a retention pond in an industrial area. Dkt. 10-3 at 42–43. A medical examiner identified injuries on Lugo's face consistent with blunt force trauma and concluded that Lugo died from strangulation. Dkt. 10-3 at 368–80. The medical examiner opined based on his observation of rigor that Lugo died between 9:40 P.M. and 10:36 P.M. on December 12, or possibly a couple of hours later. Dkt. 10-3 at 365,

1

384–85. Several weeks later, landscapers found Lugo's purse and wallet at a building nearby. Dkt. 10-3 at 57–60, 209–10.

A detective spoke to Curry who was Lugo's ex-boyfriend. Dkt. 10-3 at 86. Curry explained that he and Lugo broke off their relationship recently because Curry abused crack cocaine. Dkt. 10-3 at 87–88, 187. Curry met Lugo at 10:00 P.M. on December 12 at Burlington Coat Factory where she worked. Dkt. 10-3 at 87. Curry owed Lugo money and wanted to pay her back. Dkt. 10-3 at 87. Curry spoke with Lugo's brother the following morning and told him that, because Curry did not have any money, Lugo told him to get out of her car. Dkt. 10-3 at 88. Curry claimed that he walked home. Dkt. 10-3 at 89.

Lugo's co-worker saw Lugo leave work with Curry at 9:30 P.M. Dkt. 10-3 at 145–47. Lugo's timecard at work showed that she left work at 9:34 P.M. Dkt. 10-3 at 215. Curry's sister saw Curry standing on the sister's porch at 6:15 A.M. the following morning. Dkt. 10-3 at 349. Curry worked as a street sweeper in parking lots near where the construction workers found Lugo's body and near where the landscapers found Lugo's purse and wallet. Dkt. 10-3 at 220–21.

Lugo's brother spoke with Lugo at 9:39 P.M. and 9:45 P.M. that evening. Dkt. 10-3 at 235. At 9:39 P.M., Lugo told her brother that Curry intended to repay her for a broken camera that belonged to her brother. Dkt. 10-3 at 236. When Lugo did not return home that night, Lugo's brother called Lugo and Curry many times. Dkt. 10-3 at 235–36. The following morning, Curry told Lugo's brother that Lugo became angry because Curry did not have any money to repay her, and Lugo dropped him off on the side of the

2

road. Dkt. 10-3 at 236. Curry claimed that Lugo planned to meet with a male from Orlando. Dkt. 10-3 at 236.

A detective found Lugo's car in the parking lot of a bank. Dkt. 10-3 at 74–75. The detective observed dried blood on the center console and on the floor of the back seat and hair stuck on the headliner of the car. Dkt. 10-3 at 77–78, 92–93, 95–96, 244–47, 251–52. DNA from swabs of the blood in the car matched Lugo's DNA. Dkt. 10-3 at 121–22. Mitochondrial DNA from the hair found in the car matched mitochondrial DNA from Curry, which meant that neither Curry nor his maternal relatives could be excluded. Dkt. 10-3 at 118–21, 137–40. A camera on an ATM at the bank recorded Lugo's car pulling into the parking lot at 10:25 P.M., and an individual exiting her car at 10:39 P.M. Dkt. 10-3 at 172–73.

Walker Mayo, a fourteen-time convicted felon who met Curry in a prison drug treatment program, testified that Curry told him that Lugo became upset with Curry because she caught him smoking marijuana and discovered that he abused cocaine. Dkt. 10-3 at 178. Lugo and Curry argued about Curry's drug abuse. Dkt. 10-3 at 178. Curry repeatedly told Mayo that no one knew what time he arrived home in the early morning. Dkt. 10-3 at 179.

Robert Poindexter, an eight-time convicted felon who worked with Curry at the cafeteria in jail, testified that he asked Curry if the murder was a crime of passion, and Curry did not respond but became teary-eyed. Dkt. 10-3 at 267–68. Curry admitted abusing crack cocaine for several days before Lugo's death and tried to get money from Lugo by telling Lugo that he had money for her. Dkt. 10-3 at 264–65. Curry was upset

because Lugo planned to meet a male who wanted to offer her a job in Orlando, and Curry believed that Lugo and the male would start a romantic relationship. Dkt. 10-3 at 264–65. When discussing his case, Curry told Poindexter: "They haven't got nothing. There's no case here. They have no weapon whatsoever. If you ain't got no weapon, they ain't got no case." Dkt. 10-3 at 266. Poindexter responded, "Who said anything about a weapon? I thought she drowned." Dkt. 10-3 at 266–67. Curry lifted his head, said "Oh," and walked away. Dkt. 10-3 at 267.

Jesse Whitt, a sixteen-time convicted felon who met Curry in a prison drug treatment program, testified that he heard Curry admit that he and Lugo argued about his drug addiction on the night of her murder. Dkt. 10-3 at 298. Curry described his "ace in the hole" as the fact that police did not know when Curry arrived at his mother's home. Dkt. 10-3 at 298. Whitt heard an inmate ask Curry if the police had suggested that photographs incriminated Curry, and Curry responded, "[H]e [knew] there was no photos of him because of where he parked the car." Dkt. 10-3 at 299. Whitt asked, "What do you mean, where you parked the car?" Dkt. 10-3 at 299. Curry responded, "Oh, no, I mean because of where the car was parked." Dkt. 10-3 at 299.

The prosecution presented sworn testimony from a prior proceeding by David Valone, an unavailable witness. Dkt. 10-3 at 305–06. Curry told Valone, a two-time convicted felon who worked with Curry at the cafeteria in jail, that Lugo was very upset a week to ten days before the murder because she discovered that Curry smoked marijuana. Dkt. 10-3 at 307, 310–11. A male from Orlando wanted to meet Lugo for dinner to interview her for a job, and Curry did not approve of the dinner, did not want Lugo to

move to Orlando, and did not want her to leave his life. Dkt. 10-3 at 312. On the night of the murder, Curry met Lugo in a parking lot where she worked, "just snapped" and "freaked out" after learning about the dinner with the male, and smoked crack cocaine afterwards. Dkt. 10-3 at 312–13. Curry told Valone that no video recorded him in the parking lot and, "there's been no weapon found, so they couldn't pin it on him." Dkt. 10-3 at 313. Valone asked Curry if he committed the crime, and Curry winked and said, "You're going to think what you want to think, Vinnie." Dkt. 10-3 at 315.

Curry's mother testified on behalf of the defense. Curry's mother confirmed that Curry used to regularly ride in Lugo's car. Dkt. 10-3 at 404. The day of the murder, she drove Curry to Sarasota. Dkt. 10-3 at 408. The next day at 4:30 A.M., Lugo's brother called Curry's mother and told her that Lugo did not appear for work. Dkt. 10-3 at 409. Curry's mother went to her daughter's home to speak with Curry who had arrived earlier. Dkt. 10-3 at 409. Curry wore the same maroon and gold Florida State University sweatshirt that he wore the day before. Dkt. 10-3 at 410. No scratches or cuts appeared on Curry's face, and no mud or dirt was smeared on his clothes. Dkt. 10-3 at 410. Curry did not appear intoxicated, agitated, or fidgety. Dkt. 10-3 at 412.

Curry testified in his own defense. Curry, a twenty-four-time convicted felon, admitted that he suffered from an addiction to cocaine since 1990. Dkt. 10-4 at 34–35. Curry and Lugo broke up because of his addiction but Curry was trying to repair the relationship. Dkt. 10-4 at 37–38.

On the day of the murder, Lugo called Curry and asked to meet. Dkt. 10-4 at 44–45. Curry's mother drove Curry to Sarasota, and Curry waited for Lugo to finish work

at Burlington Coat Factory. Dkt. 10-4 at 45–47, 50. After an argument ensued in Lugo's car over money that Curry owed Lugo, Lugo refused to drive Curry home and dropped him off on the side of the road before 9:45 P.M. Dkt. 10-4 at 51–52, 97. Curry walked to his mother's home but was unable to get inside. Curry testified he then walked to his sister's home and slept outside. Dkt. 10-4 at 52–53, 55.

The next day, Curry learned that Lugo did not appear for work. Dkt. 10-4 at 56–57. Curry spoke with Lugo's brother about a male named Daniel Romero who had invited Lugo for dinner to discuss a job opportunity and who had later showed up at her work staring at her, which caused her to feel uncomfortable. Dkt. 10-4 at 57. Curry learned about Lugo's death when he spoke with police later that day. Dkt. 10-4 at 61–62.

From the stand Curry clarified his statements to the prosecution's cooperating witnesses. Valone asked Curry whether he committed the crime, and Curry responded that Valone was "going to think what [he] want[ed] to think." Dkt. 10-4 at 67–68. Curry denied winking and claimed that he suffered from a twitch in his eye because he was agitated and crying. Dkt. 10-4 at 68. Curry denied telling Poindexter that he had either abused crack cocaine or tried to lure Lugo for money. Dkt. 10-4 at 68. Curry told Whitt that police did not have a photograph of where he parked the car because he did not drive the car. Dkt. 10-4 at 71–72.

A professional film restorer reviewed the video from the ATM and testified that the video depicted a person exiting the parked car wearing dark pants and a light-colored shirt—not a maroon and gold sweatshirt. Dkt. 10-3 at 434–37.

The jury found Curry guilty of second-degree murder, and the trial court sentenced him to life in prison. Dkt. 10-2 at 288, 297. Curry appealed and raised as an issue the sufficiency of the evidence due process claim that he raises in his federal petition. Dkt. 10-5 at 2, 39–50. The state appellate court affirmed without a written opinion. Dkt. 10-5 at 2, 75.

*Post-Conviction.* Curry filed a motion for post-conviction relief and raised the four post-conviction claims that he raises in his federal petition. Dkt. 10-5 at 152–94. The post-conviction court denied relief after an evidentiary hearing. Dkt. 10-7 at 2–21. Curry appealed, and the state appellate court affirmed without a written opinion. Dkt. 10-7 at 123, 182. Curry timely filed his petition seeking relief in federal court.

## AEDPA STANDARDS

Section 2254 of Title 28 of the United States Code allows a prisoner in custody pursuant to the judgment of a state court to petition a federal court for a writ of habeas corpus on the basis that the prisoner's continued custody violates the U.S. Constitution or federal law. As amended by the Antiterrorism and Effective Death Penalty Act (AEDPA), § 2254 provides a narrow avenue for relief, imposing procedural requirements to invoke federal review and requiring federal courts to give substantial deference to state court judgments that reach the merits of any federally based claims. *See* § 2254(b), (d); *Raulerson v. Warden*, 928 F.3d 987, 995 (11th Cir. 2019).

*Exhaustion of State Court Remedies and Procedural Default.* To seek federal habeas review, a petitioner must exhaust all available state court remedies. § 2254(b)(1)(A). This requires the petitioner to "'fairly presen[t]' federal claims to the

state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). This can be achieved by the petitioner "indicat[ing] the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). Briefing an issue solely as a matter of state law is insufficient. *Nelson v. Sec'y, Fla. Dep't Corrs.*, 610 F. Supp. 2d 1323, 1332 (M.D. Fla. 2009).

Full exhaustion requires a prisoner to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In Florida, a complete round of appellate review generally requires filing a Rule 3.850 motion for postconviction relief and an appeal of the denial to one of the state's district courts of appeal. See Fla. R. App. P. 9.141; *see also Tucker v. Dep't Corrs.*, 301 F.3d 1281, 1286 (11th Cir. 2002) (Barkett, J., concurring). A prisoner's failure to present his federal claims to the state court renders those claims procedurally defaulted. *See O'Sullivan*, 526 U.S. at 848; *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

A procedural default can arise in two ways. The first is a failure to exhaust state court remedies as just explained. The second occurs when the state court declines to reach the merits of a claim and denies the claim by applying a state-law procedural

default principle—the contemporaneous objection rule, for example. *Bailey v. Nagle*, 172 F.3d 1299, 1302 (11th Cir. 1999).

Once a federal claim has been defaulted in state court, "federal habeas review of the claim[ ] is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Cause requires the petitioner to show that some objective factor external to the defense led to the default. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice requires the petitioner to show "not merely that the errors at his trial [or sentencing] created a *possibility* of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial [or sentencing] with error of constitutional dimensions." *Brown v. United States*, 720 F.3d 1316, 1333 (11th Cir. 2013) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

A miscarriage of justice sufficient to avoid a procedural default occurs only in extraordinary cases in which a constitutional violation has led to the conviction of one who is "actually innocent." *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). This requires more than prejudice. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). The petitioner must support the defaulted claim with "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. The evidence must then establish that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327.

*Standard of Review Under the AEDPA.* For claims adjudicated on the merits, the AEDPA requires the federal court to afford substantial deference to the decisions of the state courts. *Raulerson*, 928 F.3d at 996. Under the Act, a federal court will not grant relief unless the state court's decision denying relief was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A decision is "contrary to" clearly established federal law if the state court "applied a rule in contradiction to governing Supreme Court case law" or "arrived at a result divergent from Supreme Court precedent despite materially indistinguishable facts." *Dill v. Allen*, 488 F.3d 1344, 1353 (11th Cir. 2007). A decision is unreasonable "only if no 'fairminded jurist' could agree with the state court's determination or conclusion." *Holsey v. Warden, Ga. Diag. Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

## DISCUSSION

Curry raises five grounds for relief—the sufficiency of the evidence due process claim raised in his brief on direct appeal and the four post-conviction claims raised in his state post-conviction motion. As explained below, all grounds are meritless.

*Ground One: Sufficiency of the Evidence Due Process Claim.* Curry asserts that his conviction for second-degree murder violates federal due process because the prosecution failed to rebut his reasonable hypotheses of innocence at trial. Dkts. 1 at 5–6 and 2 at 9–10.

The Respondent asserts that the claim is unexhausted because Curry failed to alert the state court to the federal nature of his claim. Dkt. 10 at 14. However, in his brief on appeal, Curry both cited *In re Winship*, 397 U.S. 358 (1970) and mentioned the federal due process clause. Dkt. 10-5 at 40. Because Curry fairly presented the federal nature of his claim by citing "a case deciding such a claim on federal grounds," he adequately exhausted the claim. *Baldwin*, 541 U.S. at 32.

To the extent that Curry asserts a federal due process violation based on the prosecution's failure to rebut his hypotheses of innocence, Curry fails to state a claim. "Under federal law, the prosecution does not have 'an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt.'" *Preston v. Sec'y, Fla. Dep't Corrs.*, 785 F.3d 449, 461 (11th Cir. 2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)).

To the extent that Curry asserts a federal due process violation based on the prosecution's failure to prove the offense, the claim is meritless. Curry carried the burden to demonstrate that "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324. A reviewing court views the evidence in the light most favorable to the prosecution. *Id.* at 319. This Court looks through the state appellate court's affirmance without a written opinion on direct appeal to the trial court's denial of Curry's motion for judgment of acquittal. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The trial court denied the motion as follows (Dkt. 10-4 at 110): "[B]ased on the evidence presented in the form of the witnesses, the exhibits, including some of the statements that are alleged that the

defendant made, I'll find that there's sufficient evidence that it is a jury question and for the jury to decide." Curry fails to demonstrate that the trial court either unreasonably applied *Jackson* or unreasonably determined a fact. 28 U.S.C. § 2254(d).

Second-degree murder requires proof of "[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual." § 782.04(2), Fla. Stat. The evidence proved that Lugo was beaten and strangled to death, and her body was dumped in a retention pond. The medical examiner opined that Lugo died by strangulation around 9:30 P.M. or 10:30 P.M. Curry admitted that he was with Lugo in her car around that time, admitted that he and Lugo fought over money that evening, and admitted that he and Lugo had recently ended their relationship because of his crack cocaine addiction. Police found hair in Lugo's car containing mitochondrial DNA belonging to either Curry or his maternal relative. The hair was stuck to the headliner of the car, which was consistent with Curry's head touching the headliner while he hit and strangled Lugo from an elevated position. Curry intimated to inmates in jail that he had murdered Lugo. Curry testified, denied killing Lugo, and claimed that Lugo dropped him off at 9:45 P.M. just before the murder. The jury heard Curry's testimony, disbelieved him, and found him guilty of the crime.

Because the evidence, viewed in the light most favorable to the prosecution, proved that Curry murdered Lugo, the state court did not unreasonably deny the claim. *Alvarez v. State*, 238 So. 3d 283, 286 (Fla. 4th DCA 2018); *Babbs v. State*, 187 So. 3d 925, 927–29 (Fla. 4th DCA 2016). *United States v. Margarita Garcia*, 906 F.3d 1255,

1273–74 (11th Cir. 2018) ("As the Supreme Court has explained, a defendant who chooses to take the stand runs 'the risk that in so doing he will bolster the Government case enough for it to support a verdict of guilty.'") (quoting *McGautha v. California*, 402 U.S. 183, 215 (1971)). Ground one is therefore denied.

### Ground Two, Sub-Ground One: Manifest Injustice Arising from Prosecution's Use of Jailhouse Informants and Ineffective Assistance for Failing to Move to Suppress Statements by Cooperating Witnesses Valone.

Curry asserts that a manifest injustice arose from the prosecution's use of jailhouse informants to illicit incriminating statements from him, and trial counsel was ineffective for not moving to suppress statements by the cooperating witness, David Valone. Dkts. 1 at 8–9 and 2 at 10–11. He contends that he invoked his Fifth Amendment and Sixth Amendment rights before the prosecutor directed the informants to elicit the incriminating statements. Dkt. 2 at 10. Trial counsel had moved to suppress Valone's statements, Dkt. 10-2 at 160–61, but withdrew the motion, Dkt. 10-2 at 172, because he "felt that [he] couldn't — connect all the dots that [he] wanted to connect." Dkt. 10-2 at 320–21.

This Court looks through the state appellate court's affirmance without a written opinion to the post-conviction court's denial of Curry's Rule 3.850 motion. *Wilson*, 138 S. Ct. at 1192. The post-conviction court correctly denied the claim. Dkt. 10-7 at 6–14. A judge signed the warrant for Curry's arrest for the murder on November 6, 2007, and an information charged him with the murder on November 21, 2007. Dkt. 10-2 at 49–51. Police arrested Curry for stealing checks from his mother two years earlier in 2005. Dkt. 10-4 at 66. Curry spoke with Valone and Poindexter about the murder investigation while

he was detained for the theft charges, Dkts. 10-3 at 261–62 and 10-7 at 83–84, and spoke with Whitt and Mayo while he was serving a prison sentence for his subsequent convictions for the thefts. Dkt. 10-4 at 69–70. Police arrested Curry for the murder after he finished serving his prison sentence for the thefts. Dkt. 10-4 at 71–74.

Even if Curry had invoked his Sixth Amendment right to counsel for theft charges in 2005, the Sixth Amendment right to counsel is offense specific, and Curry could not have invoked that right for the murder prosecution in 2007. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) ("The Sixth Amendment right, however, is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'") (citation omitted).[1]

Even though the Fifth Amendment right to counsel is not offense specific, *Arizona v. Roberson*, 486 U.S. 675, 677 (1988), Valone, Poindexter, Whitt, and Mayo were inmates, and Curry spoke with them while he was an inmate in jail and prison. Because the conversations between Curry and the informants did not implicate the concerns of coercion underlying *Miranda v. Arizona*, 384 U.S. 436 (1966), and Curry was not in "custody" for *Miranda* purposes while in prison, the conversations did not violate his Fifth Amendment right to counsel. *Howes v. Fields*, 565 U.S. 499, 512 (2012) ("[S]ervice

---

[1] A prosecutor or police officer may violate a defendant's Sixth Amendment right to counsel by deliberately employing a jailhouse informant to elicit incriminating statements from a defendant after the right to counsel attaches. *See Maine v. Moulton*, 474 U.S. 159, 176 (1985); *United States v. Henry*, 447 U.S. 264, 274 (1980).

of a term of imprisonment, without more, is not enough to constitute *Miranda* custody."); *Illinois v. Perkins*, 496 U.S. 292, 296 (1990) ("Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate.").

Because a motion to suppress the statements by Curry to the informants would not have succeeded, trial counsel was not ineffective, and the post-conviction court did not unreasonably deny the claim. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief."). Ground two, sub-claim one is therefore denied.[2]

***Ground Two, Sub-Ground Two: Newly Discovered Recantation of Valone's Testimony at Trial.***   Curry contends that Valone recanted his trial testimony in an affidavit six years after trial. Dkt. 1 at 9. In an affidavit attached to Curry's post-conviction motion, Valone stated that the detectives approached him, provided him details about the murder, and suggested that he befriend Curry and elicit incriminating statements from him about the murder. Dkt. 10-5 at 195–96. The detectives wrote a letter

---

[2] The state appellate court granted Curry's petition alleging ineffective assistance of appellate counsel, vacated his conviction, and remanded for a new trial. *Curry v. State*, 64 So. 3d 152 (Fla. 2d DCA 2011). The Respondent submits a motion to suppress that Curry filed before his first trial and a transcript of a hearing on that motion. Dkt. 10-4 at 196–210, 212–261. Because neither the motion nor the transcript was transmitted with the record on state post-conviction appeal, this Court cannot consider those documents on federal habeas. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

to authorities in Michigan, where Valone had a pending criminal case, confirming his assistance with the investigation in this case. Dkt. 10-5 at 196. Valone swore that Curry never made any incriminating statement about the murder. Dkt. 10-5 at 196. Curry asserts that this newly discovered evidence demonstrates that trial counsel was ineffective, and the outcome of his trial would have changed. Dkts. 1 at 9–10 and 2 at 11–12. He contends that trial counsel withdrew the motion to suppress statements by Valone only because he could not establish that police directed Valone to elicit incriminating statements from Curry. Dkts. 1 at 9–10 and 2 at 11–12.

To the extent that Curry asserts a newly discovered evidence claim based on the recantation, the claim is not cognizable on federal habeas. *Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."); *Swindle v. Davis*, 846 F.2d 706, 707 (11th Cir. 1988) ("Newly discovered evidence which goes only to the guilt or innocence of the petitioner is not sufficient to require habeas relief.").[3]

To the extent that Curry asserts an ineffective assistance of counsel claim, trial counsel was not ineffective. Valone signed the affidavit on September 30, 2014, six years after Curry's trial. Dkt. 10-5 at 195–97. Because the affidavit with the recantation was

---

[3] Florida law recognizes a newly discovered evidence claim on post-conviction, and the post-conviction court reviewed Curry's claim under the relevant standard. Dkt. 10-7 at 13–16. *Jones v. State*, 591 So. 2d 911, 915 (Fla. 1991) ("[W]e hold that henceforth, in order to provide relief [for a newly discovered evidence claim on post-conviction], the newly discovered evidence must be of such nature that it would *probably* produce an acquittal on retrial.").

not available to trial counsel at the time of representation, trial counsel was not ineffective for failing to move to suppress Valone's statements with the affidavit. *Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Even if the affidavit was available to trial counsel before trial, Curry could not demonstrate prejudice under *Strickland*. At the post-conviction evidentiary hearing, Curry presented testimony by Valone to prove his recantation, and the post-conviction court found Valone "not credible at all." Dkt. 10-7 at 13. This credibility determination receives deference on federal habeas. *Consalvo v. Sec'y, Dep't Corrs.*, 664 F.3d 842, 845 (11th Cir. 2011) ("Federal habeas courts have 'no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'") (citation omitted). Also, Curry was pretrial detained on the theft charges when he spoke with Valone. An information charged Curry with the murder two years later. Even if a detective deliberately employed Valone to elicit incriminating statements from Curry, the conversations between Curry and Valone in jail did not implicate the concerns of coercion in *Miranda*, and Curry's Sixth Amendment right to counsel had not attached in the murder prosecution. *McNeil*, 501 U.S. at 175; *Perkins*, 496 U.S. at 296. Because a motion to suppress supported by Valone's recantation would not have succeeded, Curry could not demonstrate a reasonable probability that the outcome at trial would have changed. *Strickland*, 466 U.S. at 694; *Pinkney*, 876 F.3d at 1297. Also, Valone was just

one of several jailhouse witnesses, not a vital piece of the prosecution given Curry's own

trial testimony denying the crime, which the jury disbelieved. Ground two, sub-ground

two is therefore denied.

**Ground Two, Sub-Ground Three: Prosecution Violated *Giglio* by Presenting**

**False Testimony by Valone.** Curry asserts that the prosecutor violated *Giglio v. United*

*States*, 405 U.S. 150 (1972), by presenting Valone's testimony at trial which he contends

was false. Dkts. 1 at 10 and 2 at 12. To demonstrate a *Giglio* claim, a defendant must

show "'. . . [1] that the prosecutor knowingly used perjured testimony, or failed to

correct what he subsequently learned was false testimony, and [2] that the falsehood

was material.'" *Raleigh v. Sec'y, Fla. Dep't Corrs.*, 827 F.3d 938, 949 (11th Cir. 2016)

(quoting *Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1277 (11th Cir. 2005)). "A

falsehood is material if there is any reasonable likelihood that it could have affected the

result." *Raleigh*, 827 F.3d at 949 (quotation marks and citation omitted).

This Court looks through the state appellate court's affirmance without a written

opinion to the post-conviction court's denial of Curry's Rule 3.850 motion. *Wilson*,

138 S. Ct. at 1192. The post-conviction court correctly concluded that Curry failed to

prove his claim. Dkt. 10-7 at 16–18. At the post-conviction evidentiary hearing, Valone

testified that he had falsely testified at trial, Dkt. 10-6 at 89–106, but the post-

conviction court found him "not credible at all." Dkt. 10-7 at 13. This credibility

determination receives deference on federal habeas. *Consalvo* , 664 F.3d at 845. Also,

Valone signed the affidavit recanting his testimony six years after Curry's trial. Dkt. 10-5

at 195–97. At the hearing, Curry failed to present credible evidence to demonstrate that

the prosecutor knew, or should have known, at the time of trial that Valone's testimony was false. *Ford v. Hall*, 546 F.3d 1326, 1331 (11th Cir. 2008) ("*Giglio* error, a species of *Brady* error, occurs when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury.") (citation and internal quotations omitted).[4]

Lastly, Curry failed to demonstrate that Valone's testimony (even if false) was material. *Raleigh*, 827 F.3d at 949. At trial, Valone testified that Curry spoke to him and Poindexter in jail about the murder. Curry told them that he and Lugo argued about Curry's drug abuse, that Curry met Lugo in the parking lot of the store where she worked on the night of the murder, that Curry "just snapped" when he learned that a male wanted Lugo to work for him in Orlando and wanted to meet Lugo for dinner to discuss the job, and that Curry abused crack cocaine after he became angry. Dkt. 10-3 at 310–13. Curry told them that police could not "pin" the murder on him because police did not find a weapon or a video of him in the parking lot. Dkt. 10-3 at 313–14. When Valone asked Curry whether he committed the crime, Curry winked at Valone and responded, "You're going to think what you want to think, Vinnie." Dkt. 10-3 at 314–15.

Valone's testimony concerning Curry's incriminating statements was cumulative to testimony by the other witnesses at trial. Poindexter testified that he was present many

---

[4] At the time of Curry's trial, Valone faced charges for capital sexual battery. Dkt. 10-6 at 130–34. Valone refused to testify in person and became an unavailable witness because "[he] was very uncomfortable doing anything for the State at that time, due to the fact that how can they entrust me to give testimony against somebody else, when they have me locked up under allegations that they don't believe me on. So it's kind of hypocritical to me." Dkt. 10-3 at 275.

times when Curry discussed the murder with Valone. Dkt. 10-3 at 261–63. Curry told

Poindexter that he abused crack cocaine on the day of the murder, that he was very upset

because a male had offered Lugo a job in Orlando, that he was concerned the job offer

would lead to a romantic relationship between the male and Lugo, and that he told Lugo

that he wanted to meet to give her money that he owed her but "he was actually trying to

lure her to try to get more money to support his [drug] use." Dkt. 10-3 at

264–65. Curry told Poindexter and Valone, "They haven't got nothing. There's no case

here. They have no weapon whatsoever. If you ain't got no weapon, they ain't got no

case." Dkt. 10-3 at 266. Poindexter and Valone questioned why Curry spoke about a

weapon because they thought Lugo had drowned, and Curry lifted his head, said, "Oh,"

and walked away. Dkt. 10-3 at 267. Poindexter confronted Curry and asked him if the

murder was a crime of passion, and Curry responded with tears in his eyes that he did not

want to discuss the crime anymore. Dkt. 10-3 at 267–68.

Whitt heard some inmates tell Curry that police suggested that photographs

incriminated him, and Curry responded, "[T]here was no photos of him because of where

he parked the car." Dkt. 10-3 at 298–99. Whitt asked, "[W]hat do you mean, where you

parked the car?" Dkt. 10-3 at 299. Curry replied, "Oh, no, I mean because of where the

car was parked." Dky. 10-3 at 299. Curry told Whitt that police did not know when Curry

returned to his mother's house that night, and that only Curry knew when he returned to

his mother's house. Dkt. 10-3 at 298–99. Curry repeatedly told Mayo, "[N]obody knew

what time he got home that morning." Dkt. 10-3 at 179.

Poindexter repeated Valone's testimony about his crack cocaine abuse on the day of the murder and his reaction to learning that Lugo planned to meet the male about the job in Orlando. Poindexter, Whitt, and Mayo repeated Valone's testimony concerning the lack of evidence proving his guilt. Also, just as Valone testified that Curry winked when asked if he committed the crime, Poindexter testified that tears welled up in Curry's eyes when asked if the murder was a crime of passion and Whitt testified that Curry inadvertently admitted that he parked Lugo's car at the bank. Even without Valone's testimony, Poindexter and Whitt testified that Curry intimated that he committed the crime.

Curry did not demonstrate that these additional cooperating witnesses recanted or falsely testified. These additional cooperating witnesses largely repeated Valone's testimony concerning Curry's incriminating, somewhat oblique, statements. Curry has not demonstrated "any reasonable likelihood that [Valone's testimony] could have affected the result," and the post-conviction court did not unreasonably deny the claim. *Raleigh*, 827 F.3d at 949. For the same reason, Valone's testimony did not have "'a substantial and injurious effect or influence in determining the jury's verdict,'" and any *Giglio* error was harmless. *Trepal v. Sec'y, Fla. Dep't Corrs.*, 684 F.3d 1088, 1117 (11th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). Ground two, sub-ground three is therefore denied.

**_Ground Two, Sub-Ground Four: Prosecution Violated Brady by Failing to Disclose Recantation by Valone._** Curry asserts that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose to the defense that Detective

Diamond and Detective Waldron met with Valone, provided him details about the murder, encouraged him to befriend Curry, asked him to enlist Poindexter to elicit incriminating statements from Curry, and wrote a letter on his behalf to authorities in Michigan where Valone had pending charges. (Docs. 1 at 10–11 and 2 at 13) For a *Brady* violation, a defendant must demonstrate: "(1) that the evidence was favorable to the defendant, either because it is exculpatory or impeaching; (2) that the prosecution suppressed the evidence, either willfully or inadvertently; and (3) that the suppression of the evidence resulted in prejudice to the defendant." *Rimmer v. Sec'y, Fla. Dep't Corrs.*, 876 F.3d 1039, 1054 (11th Cir. 2017). To establish prejudice, the defendant must show that the suppressed evidence was material, or that "there is a reasonable probability that, had the suppressed evidence been disclosed, the result of the proceeding would have been different." *Rimmer*, 876 F.3d at 1054.

This Court looks through the state appellate court's affirmance without a written opinion to the post-conviction court's denial of Curry's Rule 3.850 motion. *Wilson*, 138 S. Ct. at 1192. The post-conviction court correctly concluded that Curry failed to prove the claim. Dkt. 10-7 at 19–20. At the post-conviction evidentiary hearing, Valone testified that Detective Diamond told him details about the murder. Dkt. 10-6 at 85, 99–101. Valone testified that he told the detectives that he had recruited Poindexter to elicit incriminating statements from Curry, and the detectives "said—they agreed it was a good idea because [Valone] was leaving." Dkt. 10-6 at 93–94. The post-conviction court found Valone "not credible at all," Dkt. 10-7 at 13, and this credibility determination receives deference on federal habeas. *Consalvo* , 664 F.3d at 845.

Also, Valone signed the affidavit recanting his testimony six years after Curry's trial. Dkt. 10-5 at 195–97. Curry failed to demonstrate that the prosecution possessed evidence of Curry's recantation before trial and failed to disclose it. *Riechmann v. Fla. Dep't Corrs.*, 940 F.3d 559, 580 (11th Cir. 2019).

Curry failed to further demonstrate that the prosecution suppressed evidence that the detectives met with Valone, encouraged him to elicit incriminating statements from Curry, and wrote a letter on his behalf to authorities in Michigan. On cross-examination at trial, Valone admitted that, while he was speaking with Curry in jail, he met with Detective Diamond. The detective asked Valone to memorialize his conversations with Curry in letters and directed Valone to mail those letters to a specific name and address. Dkt. 10-3 at 322–24. Valone asked Detective Diamond if the detective wanted Valone to ask Curry any specific question, and the detective replied, "Well, you know, you could tell [ ] Curry something that maybe you feel bad, or you did bad in life and how you felt better coming clean with it." Dkt. 10-3 at 324. Valone admitted that he asked Detective Waldron to submit a letter on his behalf to authorities in Michigan where Valone had a pending criminal case. Dkt. 10-3 at 318–20. Valone faced seven to thirteen months in prison and received a probationary sentence which the Michigan court allowed him to serve in Florida. Dkt. 10-3 at 319–20.

Lastly, Curry failed to prove prejudice under *Brady*. At the post-conviction evidentiary hearing, Valone testified that Curry told him most of the details of the crime, and Valone embellished those details or took them out of context in his letters to the detectives. Dkt. 10-6 at 90–93, 94–99, 101–05. Valone testified that Detective

Diamond told him only two very specific details about the crime. At trial, defense trial counsel thoroughly cross-examined Valone on both details.

The first detail concerned the crime scene. At the evidentiary hearing, Valone testified that Detective Diamond told him that Lugo was floating in a retention pond without shoes and her purse and mobile telephone were missing. Dkt. 10-6 at 99–100. Valone clarified that he and Curry did discuss that police had found Lugo in the retention pond and that her purse and telephone were missing because "it was in the newspaper, so it wasn't like it was an unknown thing to people . . . ." Dkt. 10-6 at 99. He claimed that the detective told him about Lugo's missing shoes because "that was a fact that no one knew." Dkt. 10-6 at 100. At trial, Valone testified that Curry told him that Lugo was found floating in a retention pond without shoes and that her purse and mobile telephone were missing. Dkt. 10-3 at 312–13. On cross-examination, trial counsel confronted Valone with the fact that Curry's comments about the crime scene, including the missing shoes, were based on well-publicized facts. Dkt. 10-3 at 329–31. Valone further conceded that Curry never told him that Curry "was the one who left [Lugo] floating in the retention pond." Dkt. 10-3 at 330.

The second detail concerned Curry's reaction to Lugo's meeting with the male from Orlando. At the evidentiary hearing, Valone testified that he told Detective Diamond that Curry was upset that Lugo planned to meet Curry and his mother at church but cancelled to meet with the male from Orlando who was going to offer her a job. Dkt. 10-6 at 100–01. During the claimed discussion, Detective Diamond told Valone that Curry must have "snapped," Valone corrected the detective that Curry was

"very upset," and the detective repeated, "[N]o, he snapped." Dkt. 10-6 at 101. Valone

replied, "[O]h yeah, yeah, he snapped, he freaked out." Dkt. 10-6 at 101. The detective

told Valone, "[W]ell, make sure you put that in the letter and send it to me." Dkt. 10-6

at 101.

On cross-examination at trial, trial counsel confronted Valone on his use of the

word "snapped" in his letter to the detective. Dkt. 10-3 at 337–38, 343–44. Valone

agreed that his letter did not state that Curry "snapped" over "any argument or anything

to do with Orlando." Dkt. 10-3 at 337–38, 343. Valone further agreed that he wrote in

the letter that Curry "snapped" in response to the pressure that the detectives had

exerted on Curry during a meeting about the murder. Dkt. 10-3 at 338. On redirect

examination, Valone contradicted himself and testified that he wrote in the letter that

Curry "snapped" after Curry and Valone discussed that police found Lugo floating in a

pond without shoes—not her meeting with the male about the job in Orlando. Dkt. 10-3

at 343.

Even if the prosecution failed to disclose to the defense that the detective gave

Valone these two specific details about the crime, the defense thoroughly impeached

Valone on those details at trial. Also, the three other cooperating witnesses, who largely

echoed Valone's testimony about Curry's incriminating statements, would not have

suffered the same impeachment. Consequently, Curry did not demonstrate that "there is

a reasonable probability that, had the suppressed evidence been disclosed, the result of

the proceeding would have been different," and the post-conviction court did not

unreasonably deny the *Brady* claim. *Rimmer*, 876 F.3d at 1054. *United States v.*

*Brester*, 786 F.3d 1335, 1339 (11th Cir. 2015) ("[W]e have repeatedly held that the failure to disclose 'merely cumulative' impeachment evidence does not establish prejudice.") (citations omitted). Ground two, sub-ground four is therefore denied.

Accordingly, it is **ORDERED** that:

1.      The petition for writ of habeas corpus (Dkt. 1) is **DENIED**.

2.      The Clerk is directed to enter judgment accordingly and to close the case.

3.      Because Curry neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** at Tampa, Florida, on June 1, 2022.

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**